# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Case No. 05-25081 (ASH) |
| DOUGLAS E. PALERMO, | Chapter 7 |
| Debtor. | |
| DAVID R. KITTAY, TRUSTEE, | |
| Plaintiff, | Adversary Proceeding No. 08-08205 (ASH) |
| v. | |
| DANIEL MCLEAN, MCL COMPANIES OF CHICAGO, INC., and SB HOUSING ENHANCEMENT, LLC, | |
| Defendants. | |

## DEFENDANTS' MOTION TO WITHDRAW THE
## REFERENCE FROM THE BANKRUPTCY COURT

Defendants Daniel E. McLean, MCL Companies of Chicago, Inc., and South Boston

Enhancement, LLC hereby move, pursuant to 28 U.S.C. § 157(d)(e) and Rule 5011 of the

Federal Rules of Bankruptcy Procedure, to withdraw the reference of this Adversary Proceeding

from the Bankruptcy Court for the Southern District of New York.

## PRELIMINARY STATEMENT

The Defendants have a constitutional right to a jury trial in this matter, and thus the right

to withdraw the reference from the bankruptcy court.  The Supreme Court of the United States

has held that defendants in adversary proceedings in which a bankruptcy trustee asserts

fraudulent conveyance claims have a Seventh Amendment right to a jury trial, unless such

defendants have themselves asserted claims as creditors against the bankruptcy estate.  In 1994,

Congress removed the bankruptcy courts' authority to conduct jury trials, even in core proceedings, absent special designation by the district court *and* the express consent of the parties. The Defendants have not asserted any claims as creditors against the estate, have requested a jury trial in this proceeding, and do not consent to such trial in bankruptcy court. Thus, the reference of this matter must be withdrawn so that the matter must be tried in district court.

## BACKGROUND

1.      On October 14, 2005 (the "Petition Date"), Douglas E. Palermo ("Debtor") filed a petition seeking relief under Chapter 7 of Title 11, United States Code in the United States Bankruptcy Court for the Southern District of New York.

2.      On January 7, 2008, the Trustee, David R. Kittay ("Plaintiff") served the Defendants with an Adversary Complaint (the "Complaint"). A copy of the Complaint (without exhibits) is attached hereto as Exhibit A. By agreement of the parties and order of the Court, the Adversary Complaint relates back to a complaint filed by the Plaintiff against the same Defendants and other parties on or about October 12, 2007.

3.      The Plaintiff seeks to avoid four alleged transfers from the Debtor to the Defendants as fraudulent conveyances and to recover the amount of such transfers directly from the Defendants.  Three of these transfers, which the Complaint styles the "MCL Transfers," are of the same type:  in each, an MCL entity agreed to pay the Debtor a broker's fee for arranging a real estate transaction, contingent upon the transaction's closing. The fourth alleged transfer was the sale by the Debtor to the Defendants of 80% of his interest in an option to purchase and develop land. The Trustee alleges that the purchase amount paid by the Defendants in this transaction was unreasonably low.

4.     Prior to the filing of this Adversary Proceeding, none of the Defendants had previously made any appearance, or asserted or filed any claim, in the Debtor's bankruptcy proceeding, other than to respond to a non-party subpoena served upon them by one of the Debtor's creditors.

5.     The Defendants are filing this motion to withdraw the reference simultaneously with their answer to the Complaint and partial motion to dismiss.

6.     The Defendants are also filing a jury trial demand contemporaneously with this Motion. The Defendants do not consent to such jury trial in bankruptcy court.

7.     Under the Bankruptcy Court's scheduling order, this case must be trial-ready by April 30, 2008.

8.     No substantive proceedings have yet occurred in Bankruptcy Court in this Adversary Proceeding. The only proceedings thus far have been two initial conferences to discuss scheduling matters and the division of the Trustee's original complaint against numerous defendants into separate complaints against smaller groups of defendants.

## ARGUMENT

### I.    DEFENDANTS ARE ENTITLED TO A JURY TRIAL IN THIS MATTER IN DISTRICT COURT

There is no question but that the Defendants are entitled to a jury trial in district court and that the reference to bankruptcy court of this matter must therefore be withdrawn before trial. The Supreme Court has held that defendants in adversary proceedings to recover alleged fraudulent conveyances have an absolute Seventh Amendment right to a jury trial unless they have submitted to the bankruptcy court's equitable jurisdiction by filing claims as creditors. *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990); *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 46, 49 (1989). The Defendants have not asserted or filed any claims against the

Debtor's estate and, therefore, have not consented to the equitable jurisdiction of the bankruptcy court. Thus, the MCL Defendants are entitled to a jury trial.

Neither is there any question that the bankruptcy court lacks authority to conduct a jury trial in this case. A bankruptcy court is authorized to conduct a jury trial only "if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C §157(e); *Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, No. 98-B-47203, 2003 WL 23021972, at *3 (Bankr. S.D.N.Y. Dec. 24, 2003) (absent express consent of all the parties, the bankruptcy court may not conduct a jury trial). The Defendants have demanded a jury trial and have not consented to such trial in bankruptcy court.[1]

## II.    THE REFERENCE TO BANKRUPTCY COURT OF THIS MATTER SHOULD BE WITHDRAWN IMMEDIATELY

Because the Defendants have moved for withdrawal of reference early in the proceedings before the bankruptcy court has invested any substantial time on the case, interests of efficiency and uniformity of bankruptcy administration will be served by an immediate withdrawal of the reference, rather than waiting until trial. "Due to the fact that a District Court Judge must eventually preside over the jury trial in this matter, it would constitute a tremendous waste of judicial resources to permit the bankruptcy judge to continue to maintain jurisdiction over the issues presented in this litigation." *Gumport v. Growth Fin. Corp. (In re Transcon Lines)*, 121 B.R. 837, 838 (Bankr. C.D. Cal. 1990). In any event, the Bankruptcy Court has ordered that this

---

[1] Because 28 U.S.C. § 157(e) requires the consent of all the parties to a jury trial in bankruptcy matters regardless whether they are core or non-core, it is no longer necessary for the Court to make a coreness determination, as previously required by *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993), which was decided before Section 157(e) was enacted. *See, e.g., Rickel & Assocs., Inc.*, 2003 WL 23021972, at *3, n.6 ("the absence of consent dooms a jury trial . . . even if the case were viewed as a core proceeding . . . . Prior to the adoption of section 157(e), the core/non-core distinction was necessarily a threshold issue."); *In re Magnesium Corp.*, No. 01-B-14312, 2004 WL 1161172, at *1 n.1 (S.D.N.Y., May 24, 2004).

case must be trial-ready by April 30, 2008. Thus, there would be little advantage in ordering that pre-trial proceedings proceed in the Bankruptcy Court, since only a short time will remain before trial at the time this Court issues its ruling on this motion.

## CONCLUSION

WHEREFORE, Defendants move that the reference be withdrawn as to this Adversary Proceeding immediately and in its entirety to the District Court, and that the District Court grant such other and further relief as it deems just and proper.

| Dated: January 25, 2008 | SCHIFF HARDIN LLP <br><br> By: _____ <br> Carl W. Oberdier (CO-4150) <br> William P. Scott (WS-6586) <br> Attorneys for Defendants <br> 900 Third Avenue, 23rd Floor <br> New York, NY 10022 <br> (212) 753-5000 <br> (212) 753-5044 (facsimile) |
|---|---|
| | Of Counsel: <br><br> **SCHIFF HARDIN LLP** <br> 6600 Sears Tower <br> 233 South Wacker Drive <br> Chicago, IL 60606-6473 <br> (312) 258-5500 <br> (312) 258-5600 (facsimile) <br> Eugene J. Geekie, Jr. <br> Shelley L. Merkin |

STORCH AMINI & MUNVES, P.C.
140 East 45th Street, 25th Floor
New York, New York 10017
Bijan Amini (BA 3533)
Russell Bogart (RB 0320)
Jonathan Bardavid (JB 0072)
212-490-4100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
In re:                                                        :        Chapter 7
                                                              :
DOUGLAS E. PALERMO,                                           :        Case No. 05 25081 (ASH)
                                                              :
                                    Debtor.                   :
-------------------------------------------------------------- -x
                                                              :
 DAVID R. KITTAY, TRUSTEE,                                    :        Adv. Pro. No. 07-8310 (ASH)
                                                              :
                                    Plaintiff,                :
                                                              :
     - against -                                              :
                                                              :        **AMENDED COMPLAINT**
                                                              :
DOUGLAS PALERMO                                               :
                                                              :
                                    Defendant.                :
-------------------------------------------------------------- x

David R. Kittay (the "Trustee" or "Plaintiff"), as successor Chapter 7 successor Trustee

of the bankruptcy estate of Douglas E. Palermo (the "Debtor"), by his attorneys, Storch Amini &

Munves, P.C., for his complaint against the Debtor, alleges as follows:

### Introduction

1.      On October 14, 2005, the Debtor filed a petition seeking relief under Chapter 7 of

Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for

the Southern District of New York (the "Court").

2.      On October 16, 2005, Eric Kurtzman was appointed Chapter 7 trustee of the Debtor's estate.

3.      Mr. Kurtzman subsequently passed away and, on January 23, 2006, David R. Kittay was appointed Chapter 7 successor Trustee.

4.      Plaintiff is the duly qualified and acting Trustee herein.

5.      This is an adversary proceeding for conversion, and the turn over of property of the estate pursuant to Sections 542(a) and (e), of the Bankruptcy Code and Rule 7001 et seq. of the Federal Rules of Bankruptcy Procedure.

## Jurisdiction and Venue

6.      This Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 1134(b) and 157(a) and (b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.

7.      This is a core proceeding under 28 U.S.C. §§ 157(b) (2) (A), (E), (H) and (O) and arises in the Chapter 7 case of the Debtor pending before this Court.

8.       Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

## THE PARTIES

9.      The Plaintiff maintains an office at 100 White Plains Road, Tarrytown, New York 10591.

10.     The Debtor is an individual.

2

## FACTS

11.     Since 1970, the Debtor has worked as a self-employed real estate consultant.  The services he provided included identifying real property development sites for clients, procuring financing, and identifying potential purchasers or joint venture partners.

12.     Morris Silver ("Silver") is a certified public accountant who provided accounting services to the Debtor and to certain of the Debtor's businesses.  Silver also occasionally loaned money to the Debtor before and after 1990.  Silver organized and controlled an entity called Doubet, LLC ("Doubet").

13.     In 1990, Silver commenced three lawsuits against the Debtor in the Supreme Court of the State of New York, Nassau County, seeking to recover unpaid accounting fees and unpaid notes executed by the Debtor.  Silver obtained three default judgments against the Debtor in 1990, in the aggregate amount of $1,017, 206 ("State Court Judgments").  As of the date of the Debtor's bankruptcy filing, the Debtor owed $2,751,299, including statutory interest, on the State Court judgments.  Silver assigned the three State Court Judgments to Doubet.

14.     On March 3, 2006, after the filing date, Doubet commenced an adversary proceeding in the Debtor's bankruptcy case titled, <u>Doubet, LLC v. Douglas E Palermo</u>, Adv. Proc. No. 06-8285A (SDNY Bkrptcy), seeking that the Debtor should be denied a discharge under the Bankruptcy Code, 11 U.S.C. §§ 727(a)(2), (3) and (5).  In a July 9, 2007 decision, issued after trial, the Court determined that the discharge should be denied on all three grounds.  <u>See</u> the July 9, 2007 Decision annexed hereto as Exhibit A ("The Discharge Decision").

15.     The Discharge Decision found that the Debtor has been insolvent since the time that the State Court Judgments were entered against the Debtor in 1990.  Additionally, the Court

3

found that the Debtor "orchestrated complex deals to evade his creditors" and siphoned "off his money to his various shell entities." Id. at 17-19.

## I.    Entities That The Debtor Controlled

16.    N.M. Palermo, Inc. ("N.M. Palermo") was a company organized under the laws of the State of New Jersey on or about December 1927 by the Debtor's grandfather. N.M. Palermo's corporate charter was declared void by the State of New Jersey in or about May 1981.

17.    Beekman Street Advisory Corporation ("Beekman") was formed in or about 1996 and ceased to exist as a corporation in good standing in 1999. The Debtor was Beekman's sole shareholder.

18.    Argus Asset Management, LLC ("Argus") was purportedly founded in 2004 and ceased operations in 2005. The Debtor was the sole shareholder of Argus, which maintained a bank account.

19.    Norfolk Financial, LLC ("Norfolk"), was purportedly formed in 2004 but ceased operations in 2005. Debtor was the sole shareholder of Norfolk, which maintained a bank account.

20.    Butterfield Trust I LLC ("Butterfield Trust") was purportedly formed by David Buchanan as managing member and sole shareholder between 2001 and 2002. The management of Butterfield Trust was subsequently transferred to William Chipman, a friend, accountant and business associate of Debtor.

21.    Brook Financial LLC ("Brook") was organized in or about 2005 by the Debtor. The Debtor was the sole owner of Brook Financial LLC.

22.    Residual Equity Corp. ("Residual") was organized under the laws of Delaware as

a corporation in December 2001.

23.    The above mentioned entities collectively shall be referred to as the "Palermo Entities."

24.    Palermo occasionally conducted his business activities under the names of the Palermo entities and funneled money which he earned to or through such entities. The Debtor cannot produce any organizational documents for any of these entities. Upon information and belief, the Palermo entities did not exist as lawful entities, but instead were simply exploited by the Debtor as a 'doing business as' ("d/b/a") the Debtor himself in his business dealings, either for tax purposes or to conceal his assets from his creditors. The Debtor solely controlled each of the Palermo entities and commingled monies among the Palermo entities. Hence, each of the Palermo entities represented an alter ego of the Debtor.

## II.    455 Central Park West Transaction

25.    The Trustee's claims in this action are based primarily on a series of lending and real estate transactions engineered by the Debtor to avoid his creditors. These transactions are briefly summarized below, and described in more extensive detail in the Discharge Decision, annexed at Exhibit A, pp 5-8.

26.    In 1999, the Debtor collaborated with Columbia University and Bovis Lendlease to bid on a parcel of property located at 455 Central Park West (the "CPW Property").

27.    MCL Companies of Chicago ("MCL") submitted the winning bid for the CPW Property and MCL acquired the CPW Property in 1999. MCL created several entities for the purpose of purchasing and developing the property, including 455 CPW, LLC ("455 CPW") which developed the CPW Property into two buildings comprised of residential condominium

units.

28.    As MCL acquired the CPW Property, the Debtor, based on his relationship with Daniel McLean ("McLean"), President of MCL, introduced Columbia University (with which the Debtor submitted the unsuccessful bid) to MCL so that Columbia University could purchase condominium units at the CPW Property from MCL.

29.    Columbia University contracted to purchase 53 condominium units in the 455 Central Park West project from MCL.

30.    MCL agreed to pay the Debtor a fee for introducing Columbia University to MCL as the buyer of 53 condominium units (the "455 CPW Closing").

31.    On August 28, 2001, Beekman and the Butterfield Trust (two of the Palermo entities) entered into the First Advisory Service Agreement (the "First Agreement") with 455 CPW.  Pursuant to the First Agreement, Beekman and Butterfield Trust purported to act as the exclusive financial advisor for 455 CPW in connection with the 455 CPW closing, even though all services were personally performed by the Debtor.

32.    The First Agreement provided that Debtor would receive compensation totaling $1,815,520 (the "First Agreement Fee").  The First Agreement provided that $453,880 of the First Agreement Fee was to be paid to Beekman upon 455 CPW obtaining a construction loan; the remaining $1,361,640 was payable to Butterfield Trust upon the closing of sale of the 53 condominium units from 455 CPW to Columbia University.

33.    The First Agreement also provided for a "Put and Call" option for Columbia University to purchase an additional 24 condominium units from 455 CPW.

34.    McLean negotiated and executed the First Agreement and dealt solely with the

6

Debtor in connection with the First Agreement.

35.      On or about January 29, 2002, a Second Advisory Services Agreement (the "Second Agreement") was executed between 455 CPW and N.M. Palermo.  The Second Agreement provided that 455 CPW would pay N.M. Palermo a 1% fee, or $330,000, for arranging a loan to 455 CPW through iStar, a source introduced by Debtor to 455 CPW.  The Second Agreement was signed on behalf of N.M. Palermo by the Debtor and was payable when iStar financed the loan to 455 CPW.

36.      Shortly after signing the First Agreement and Second Agreement, the Debtor requested an advance on his commissions from McLean.  McLean agreed and authorized $140,000 in advances to the Debtor, personally, in four $35,000 installments which were paid to the Debtor on February 8, March 14, April 23 and June 3, 2002.

37.      On October 28, 2002, N.M. Palermo and 455 CPW entered into an Amended Advisory Services Agreement (the "Amended Agreement") which amended the First Agreement and the Second Agreement.  In the Amended Agreement, it was acknowledged that (1) the Debtor already received an advance of $140,000 on his fees, (2) at the loan closing, iStar, the lender, would advance to Debtor the balance of Beekman's one percent commission, $313,880, which iStar could deduct from the loan to 455 CPW, (3) $1,361,640 was still due to Butterfield Trust upon closing of the sale of the condominium to Columbia University, and 4) Columbia University rather than 455 CPW would pay Palermo's balance at closing.

38.      That same day the parties agreed to Debtor's fee arrangement for the "Put and Call" agreement, even though Columbia University never purchased the additional 24 units.  The agreement provided for the same approximate amount due the Debtor, including the same

7

$120,000 due from iStar at the impending loan closing and $203,176 from Columbia University out of the purchase price at the 455 CPW closing ("Put and Call Commission"). However, this agreement, which appears to have superseded the Second Agreement, alters the payor as well as the Palermo entity designated as payee.

### III.    Restraining Notices Are Served on the Debtor

39.    In February 2003, Silver served two sets of restraining notices on various parties including the MCL Defendants, to facilitate collection of the State Court Judgments from the income due the Debtor under his real estate activities. See Discharge Decision, p. 9.

### IV.    Debtor Arranges to Circumvent the Restraining Notices

40.    Subsequent to learning of the first restraining notice, the Debtor arranged for several cash advances against the monies due to him under the First, Second and Amended Agreements from persons or entities not covered by the restraining notices. See Discharge Decision, pp 10-11. In exchange, the Debtor assigned to those persons and entities money due from the 455 Central Park West transaction.

41.    These transactions engineered to avoid the restraining notices included:

a) On July 15, 2003, the Debtor arranged for a $120,000 cash advance from Brian Farley, on behalf of PMD. The Debtor assigned to the PMD Company ("PMD") the right to collect the $203,176 Put and Call Commission at the 455 CPW Closing;

b) On October 20, 2003, the Debtor arranged a cash advance of an unidentified sum from his acquaintance and associate Joseph Korff. In exchange, the Debtor assigned Korff $300,000 of his commission at the

455 CPW Closing;

   c) On November 26, 2003, the Debtor obtained a $60,000 cash advance from McLean. In exchange, the Debtor assigned McLean $70,000 of his commission at the 455 CPW Closing;

   d) On June 15, 2004, the Debtor arranged a cash advance of an unidentified sum from Phillip Herlihy in exchange for an assignment to PMD of $90,000 of Debtor's commission at the 455 CPW Closing.

42.    On July 29, 2004, at the 455 CPW Closing, Columbia closed on its purchase of the 53 units from 455 CPW. In 2002, the Debtor already had received the $140,000 advance from McLean and the $313,880 advance from iStar. As of the time of the 455 Central Park West Closing, the Debtor still was entitled to $1,361,640, as well as the $203,176 "Put and Call" commission, totaling $1,564,816.

43.    On July 29, 2004, the Debtor's commission of $1,564,816 was distributed as follows: $901,640 to Butterfield Trust, $300,000 to Korff as per his assignment from the Debtor; $293,176 to PMD as per its two assignments; and $70,000 to MCL as per McLean's assignment.

## V.    ADDITIONAL TRANSFERS BY THE DEBTOR

44.    Within three months of the 455 CPW Closing, the Debtor spent $893,000 of the $901,640 that Butterfield Trust received at the 455 CPW Closing. See Discharge Decision, pp. 11-12. In particular, the Debtor caused the following transfers:

   a) On August 2, 2004, Butterfield Trust wired $60,000 to John Livingston to repay a loan for "living expenses";

   b) On August 3, 2004, the Debtor wired $60,000 to John Livingston for consulting

9

fees.

45.    Between August 2004 and January 2005, the Debtor wired $749,500 to Norfolk, one of the Palermo entities.  Subsequently, Norfolk issued debit memos of $310,000 into his personal account and transferred $150,000 to cover a variety of loans and back payments of rent.

46.    The Debtor has failed to account for how the $310,000 was spent.

47.    The Debtor has failed to provide documentation for these alleged loans and rent payments.  Accordingly, based upon the Debtor's series of undocumented and fraudulent transfers, the Trustee concludes that the Debtor retained $460,000, consisting of the aforementioned $310,000 of unaccounted debit memos and the aforementioned $150,000 transferred to cover a variety of loans and rent.

## VI.    River East Transaction

48.    River East is a shopping center development in Chicago owned by McLean through one of his MCL entities.

49.    In 2005, the Debtor found a buyer for the retail space in River East.  Pursuant to a letter agreement between the MCL Companies and Norfolk, dated August 29, 2005, the Debtor was entitled to a $437,000 commission for this introduction ("River East Fee").  The sale relating to River East closed on January 17, 2006, several months after the Debtor filed for bankruptcy. The Debtor did not report in his bankruptcy schedule that he was entitled to the $437,000 River East Fee.  At the time of closing, 455 CPW paid a $340,200 fee to Norfolk, as the Debtor had assigned $96,800 of the fee to other parties.

50.    The Debtor arranged for McLean to distribute the River East Fee as follows: i) McLean wired $71,800 to Herlihy in repayment of $59,000 loan; ii) McLean retained $25,000 in

repayment of a $16,000 cash advance made by McLean in December 23, 2005; iii) The remaining $340,200 was disbursed to Norfolk.

51.    The Debtor remains in possession of the $340,200 from the River East Transaction.

## VII.    South Boston Development Project

52.    Prior to the summer of 2005, the Debtor owned 100% of Brook Financial, which fully owned South Boston Housing, LLC ("South Boston").  South Boston is a company incorporated by the Debtor to develop a housing project in South Boston, MA (the "South Boston Project").

53.    The Trustee has been advised that original estimates forecasted that the net income from the South Boston project would be approximately $29,500,000.

54.    McLean, through one of his entities, acquired 80% of the interest in South Boston from the Debtor. McLean paid the Debtor $170,000 for the Debtor's expenses and $322,895 for Debtor's 80% interest in South Boston  ("South Boston Transfer").

55.    From August 5, 2005 through October 27, 2005, McLean paid Norfolk $322,895, based on McLean's purchase of 80% of Brook's interest in South Boston.

56.    The Debtor through Brook retained a 20% interest in South Boston and, consequently the South Boston Project.  The Debtor did not list this interest on his bankruptcy schedules.

57.    The Debtor also introduced McLean to XE Capital to form a $50,000,000 fund for real estate investments, including the South Boston Project.  In August 2006, The Debtor received approximately $500,000 for making this introduction.  Out of this $500,000, the Debtor:

1) assigned $104,000 to Herlihy for repayment of an undisclosed cash advance; 2) assigned $22,895 to McLean for repayment of an undisclosed cash advance; and 3) received $376,105 for himself.

## VIII.  The Debtor's Unlawful Retention of the Estate's Assets

58.    In sum, the Debtor engaged in a pattern of activities designed to hinder his creditors, as described above, consisting of "taking cash advances on his future earnings, assigning his payments to those lenders in repayment, transferring his property between accounts and squandering the balances." See Discharge Decision, at p. 17.  Since the entry of the State Court Judgments in 1990, the Debtor was personally insolvent, and siphoned off his money to his various shell entities.

59.    In total, the Debtor remains in possession of at least $1,176,305 which is property of the estate ("Funds Constituting Property of the Estate"), consisting of the aforementioned i) $310,000 of unaccounted debit memos, ii) $150,000 transferred to cover a variety of loans and rent, iii) $340,200 received from the River East Transaction and iv) $376,105 relating to XE Capital and the South Boston project.

## VII.  The Instant Adversary Proceeding

60.    On October 12, 2007, the Trustee filed an adversary proceeding for turnover, conversion and fraudulent conveyance against the debtor, Daniel McLean, MCL Companies of Chicago, PMD Corporation, Brian Farley, Phillip Herlihy, Joseph Korff, John Livingston and SB Housing, LLC.  The case was captioned Kittay v. Palermo, et. al. Adv. Proc. No. 07-8310 (ASH) (herein after the "Initial Adversary Proceeding").

61.    As the fraudulent conveyances occurred via a series of related and overlapping

12

real estate transactions the Trustee included all of the defendants in the Initial Adversary Proceeding.

62.     On November 27, 2007 the parties, except for Joseph Korff and John Livingston, appeared for an initial conference before Judge Hardin.

63.     At the conference Judge Hardin indicated that he was concerned with having one adversary proceeding involving multiple defendants, some of whom may have not been involved in some of the fraudulent conveyances.

64.     Plaintiff, through counsel, maintained that the transactions in questions were related and that the facts sufficiently overlapped to warrant one adversary proceeding.

65.     After a lengthy discussion with all parties who appeared in the action, Judge Hardin adjourned the conference until December 11, 2007, and ordered the parties to confer to discuss the issue of separating the Initial Adversary Proceeding, into separate adversary proceedings.

66.     The parties thereafter met and conferred about this issue.  Although plaintiff maintains that it was appropriate to bring one adversary proceeding against all the defendants, in the interests of judicial economy, the plaintiff agreed to divide the Initial Adversary Proceeding into multiple adversary proceedings.

67.     By agreement of the parties, the plaintiff agreed to amend the complaint in the Initial Adversary Proceeding and proceed solely against the debtor in that proceeding.

68.     The parties further agreed to the plaintiff filing separate adversary proceedings against each defendant or group of related defendants, provided however, that discovery would be conducted jointly for the related adversary proceedings.

13

69.    On December 11, 2007, a conference was held before Judge Hardin, on the initial adversary proceeding.  The parties set forth, and the court accepted, their agreement, concerning how to separate the initial adversary proceeding.

70.    The plaintiff was provided until January 7, 2007 to amend the initial adversary proceeding and to file the additional separate adversary proceedings.

71.    Judge Hardin held that for purposes of the statute of limitations, the date of filing for the additional adversary proceedings would relate back to the date the Initial Adversary Proceeding was filed.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### (Turnover Pursuant to 11 U.S.C. §542)

72.    Plaintiff repeats and realleges each and every allegation above.

73.    The Debtor currently possesses and controls Funds Constituting Property of the Estate of the Debtor.  The Funds Constituting Property of the Estate constitutes an asset of the Debtor's bankruptcy estate that has benefit and value to the Debtor's bankruptcy estate.

74.    The Debtor's retention of the Funds Constituting Property of the Estate is improper.

75.    Based on the foregoing, the Court should compel the Debtor to turn over the Funds Constituting Property of the Estate of the Debtor, and any other monies the Plaintiff determines through discovery are owed to the estate, to Plaintiff.

### SECOND CLAIM FOR RELIEF
### (Turnover Pursuant to 11 U.S.C. §542)

76.    Plaintiff repeats and realleges each and every allegation above.

14

77.    The 20% interest in South Boston, which is currently held by the Debtor, constitutes property of the estate.  The 20% interest in South Boston constitutes an asset of the Debtor's bankruptcy estate that has benefit and value to the Debtor's bankruptcy estate.

78.    The Debtor remains in possession and control of the Debtor's property, *i.e.*, the 20% interest in South Boston.

79.    The Debtor's retention of the 20% interest in South Boston constituting property of the estate is improper.

80.    Based on the foregoing, the Court should compel the Debtor to turn over the 20% interest in South Boston, to Plaintiff.

## THIRD CLAIM FOR RELIEF
### (Post-Petition Transfer Pursuant to 11 U.S.C. §§ 549 And 550)

89.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.    At a hearing held on July 27, 2007 in state court litigation pending in the New York State Supreme Court between Doubet, LLC and MCL, McLean and other parties, counsel for McLean and MCL advised the state court judge that MCL and/or McLean made a payment to the Debtor after his bankruptcy filing of approximately $300,000 with the consent of the Trustee ("MCL Post-Petition Transfer").  The Trustee did not consent to this transfer.

91.    McLean also distributed the River East fee Post-Petition, in relevant part, by disbursing $340,200 to Norfolk ("River East Post-Petition Transfer").

92.    The Debtor also received post-petition $500,000 for introducing McLean to XE Capital, and out of this introduction fee, kept $376,105 ("XE Capital Post-Petition Transfer").

93.    The MCL Post-Petition Transfer, the River East Post-Petition Transfers and the XE Capital Post-Petition Transfers constituted property of the Debtor's bankruptcy estate.

94.    The MCL Post-Petition Transfer, the River East Post-Petition Transfers and the XE Capital Post-Petition Transfers occurred after the commencement of the Debtor's bankruptcy case.

95.    The MCL Post-Petition Transfer, the River East Post-Petition Transfers and the XE Capital Post-Petition Transfers were not authorized by the Bankruptcy Code or Court.

96.    By reason of the foregoing, the MCL Post-Petition Transfer, the River East Post-Petition Transfers and the XE Capital Post-Petition Transfers must be avoided and Plaintiff is entitled to recover from the Debtor, an amount to be determined at trial, which amount is not less than $1,016,305 plus interest.  Moreover, the Trustee seeks to avoid any additional post-petition transfers that are uncovered during the course of discovery in this action.

WHEREFORE,  Plaintiff respectfully requests entry of judgment against defendant:  (i) on the First Claim for Relief, directing the Debtor to turn over the Funds Constituting Property of the Estate of the Debtor, and any other monies the Plaintiff determines through discovery are owed to the estate, to Plaintiff, (ii) on the Second Claim for Relief, directing the Debtor to turn over the 20% interest in South Boston, to Plaintiff.; (iii) on the Third Claim for Relief voiding the MCL post-petition transfer, the River East post-petition transfers and the XE Capital Post-Petition Transfers and for damages in an amount to be determined at trial, which amount is not less than $1,016,305 plus interest, as well as avoiding any additional post-petition transfers that

are uncovered during the course of discovery in this action and (iv) granting the Trustee such

other relief as is just and proper.

Dated: New York, New York
      January 7, 2008

                        STORCH AMINI & MUNVES, P.C.

                        By: _____
                              Bijan Amini (BA 3533)
                              Russell Bogart (RB 0302)
                              Jonathan Bardavid (JB 0072)
                        140 East 45th Street, 25th Floor
                        New York, New York 10017
                        (212) 490-4100
                        Attorneys for Plaintiff