Call" agreement, even though Columbia University never purchased the additional 24 units. The agreement provided for the same approximate amount due the Debtor, including the same $120,000 due from iStar at the impending loan closing and $203,176 from Columbia University out of the purchase price at the 455 CPW closing ("Put and Call Commission"). However, this agreement, which appears to have superseded the Second Agreement, alters the payor as well as the Palermo entity designated as payee.

### III.    Restraining Notices Are Served on the Debtor

47.    In February 2003, Silver served two sets of restraining notices on various parties including the MCL Defendants, to facilitate collection of the State Court Judgments from the income due the Debtor under his real estate activities. See Discharge Decision, p. 9.

### IV.    Debtor Arranges to Circumvent the Restraining Notices

48.    Subsequent to learning of the first restraining notice, the Debtor arranged for several cash advances against the monies due to him under the First, Second and Amended Agreements from persons or entities not covered by the restraining notices. See Discharge Decision, pp 10-11. In exchange, the Debtor assigned to those persons and entities money due from the 455 Central Park West transaction.

49.    These transactions engineered to avoid the restraining notices included:

a)    On July 15, 2003, the Debtor arranged for a $120,000 cash advance from Brian Farley, on behalf of PMD. The Debtor assigned to PMD the right to collect the $203,176 Put and Call Commission at the 455 CPW Closing;

b)    On October 20, 2003, the Debtor arranged a cash advance of an unidentified sum from his acquaintance and associate Joseph Korff. In

9

exchange, the Debtor assigned Korff $300,000 of his commission at the 455 CPW Closing;

c)  On November 26, 2003, the Debtor obtained a $60,000 cash advance from McLean.  In exchange, the Debtor assigned McLean $70,000 of his commission at the 455 CPW Closing;

d)  On June 15, 2004, the Debtor arranged a cash advance of an unidentified sum from Phillip Herlihy in exchange for an assignment to PMD of $90,000 of Debtor's commission at the 455 CPW Closing.

50.      On July 29, 2004, at the 455 CPW Closing, Columbia closed on its purchase of the 53 units from 455 CPW.  In 2002, the Debtor already had received the $140,000 advance from McLean and the $313,880 advance from iStar.  As of the time of the 455 Central Park West Closing, the Debtor still was entitled to $1,361,640, as well as the $203,176 "Put and Call" commission, totaling $1,564,816.

51.      On July 29, 2004, the Debtor's commission of $1,564,816 was distributed as follows: $901,640 to Butterfield Trust, $300,000 to Korff as per his assignment from the Debtor; $293,176 to PMD as per its two assignments; and $70,000 to MCL as per McLean's assignment.

**V.    ADDITIONAL TRANSFERS BY THE DEBTOR**

52.      Within three months of the 455 CPW Closing, the Debtor spent $893,000 of the $901,640 that Butterfield Trust received at the 455 CPW Closing.  See Discharge Decision, pp. 11-12. In particular, the Debtor caused the following transfers:

a)  On August 2, 2004, Butterfield Trust wired $60,000 to John Livingston to repay a loan for "living expenses";

b) On August 3, 2004, the Debtor wired $60,000 to John Livingston for consulting fees.

53.    Between August 2004 and January 2005, the Debtor wired $749,500 to Norfolk, one of the Palermo entities. Subsequently, Norfolk issued debit memos of $310,000 into his personal account and transferred $150,000 to cover a variety of loans and back payments of rent.

54.    The Debtor has failed to account for how the $310,000 was spent.

55.    The Debtor has failed to provide documentation for these alleged loans and rent payments. Accordingly, based upon the Debtor's series of undocumented and fraudulent transfers, the Trustee concludes that the Debtor retained $460,000, consisting of the aforementioned $310,000 of unaccounted debit memos and the aforementioned $150,000 transferred to cover a variety of loans and rent.

## VI.    River East Transaction

56.    River East is a shopping center development in Chicago owned by McLean through one of his MCL entities.

57.    In 2005, the Debtor found a buyer for the retail space in River East. Pursuant to a letter agreement between the MCL Companies and Norfolk, dated August 29, 2005, the Debtor was entitled to a $437,000 commission for this introduction ("River East Fee"). The sale relating to River East closed on January 17, 2006, several months after the Debtor filed for bankruptcy. The Debtor did not report in his bankruptcy schedule that he was entitled to the $437,000 River East Fee. At the time of closing, 455 CPW paid a $340,200 fee to Norfolk, as the Debtor had assigned $96,800 of the fee to other parties.

58.    The Debtor arranged for McLean to distribute the River East Fee as follows: i)

11

McLean wired $71,800 to Herlihy in repayment of $59,000 loan; ii) McLean retained $25,000 in repayment of a $16,000 cash advance made by McLean in December 23, 2005; iii) The remaining $340,200 was disbursed to Norfolk.

59.     The Debtor remains in possession of the $340,200 from the River East Transaction.

## VII.   South Boston Development Project

60.     Prior to the summer of 2005, the Debtor owned 100% of Brook Financial, which fully owned South Boston Housing, LLC ("South Boston"). South Boston is a company incorporated by the Debtor to develop a housing project in South Boston, MA (the "South Boston Project").

61.     The Trustee has been advised that original estimates forecasted that the net income from the South Boston project would be approximately $29,500,000.

62.     McLean, through one of his entities, acquired 80% of the interest in South Boston from the Debtor. McLean paid the Debtor $170,000 for the Debtor's expenses and $322,895 for Debtor's 80% interest in South Boston ("South Boston Transfer").

63.     From August 5, 2005 through October 27, 2005, McLean paid Norfolk $322,895, based on McLean's purchase of 80% of Brook's interest in South Boston.

64.     The Debtor through Brook retained a 20% interest in South Boston and, consequently the South Boston Project. The Debtor did not list this interest on his bankruptcy schedules.

65.     The Debtor also introduced McLean to XE Capital to form a $50,000,000 fund for real estate investments, including the South Boston Project. In August 2006, The Debtor

received approximately $500,000 for making this introduction. Out of this $500,000, the Debtor: i) assigned $104,000 to Herlihy for repayment of an undisclosed cash advance; ii) assigned $22,895 to McLean for repayment of an undisclosed cash advance; and iii) received $376,105 for himself.

## VIII. THE DEBTOR'S UNLAWFUL TRANSFERS AND UNLAWFUL RETENTION OF THE ESTATE'S ASSETS

66. In sum, the Debtor engaged in a pattern of activities designed to hinder his creditors, as described above, consisting of "taking cash advances on his future earnings, assigning his payments to those lenders in repayment, transferring his property between accounts and squandering the balances." See Discharge Decision, at p. 17. Since the entry of the State Court Judgments in 1990, the Debtor was personally insolvent, and siphoned off his money to his various shell entities.

67. In total, the Debtor remains in possession of at least $1,176,305 which is property of the estate ("Funds Constituting Property of the Estate"), consisting of the aforementioned i) $310,000 of unaccounted debit memos, ii) $150,000 transferred to cover a variety of loans and rent, iii) $340,200 received from the River East Transaction and iv) $376,105 relating to XE Capital and the South Boston project.

68. The Debtor engaged in improper transfers to the McLean Defendants (the "McLean Transfers"), as described above, consisting of : i) assigning McLean $70,000 of his commission at the 455 CPW closing; ii) McLean's retention of $25,000 from the Debtor's River East Fee; iii) McLean's retention of $22,895 relating to XE Capital and the South Boston project.

69. The Debtor, through the "South Boston Transfer," transferred to the McLean

13

Defendants for only $322,000, 80% of the interest in Brook Financial. This transfer was for grossly inadequate consideration. Accordingly, the Trustee seeks to recover either the entire interest in South Boston (the 20% retained by the Debtor and the 80% improperly transferred to the McLean Defendants) or to recover the value of the South Boston Transfer from the McLean Defendants.

70.　　The Debtor improperly transferred to the PMD Defendants (PMD, Farley and Herlihy) $293, 176, consisting of i) assigning to PMD the right to collect the $203,176 Put and Call Commission at the 455 CPW Closing and ii) the assignment of $90,000 to PMD of the Debtor's Commission at the 455 CPW Closing ("the PMD Transfers").

71.　　In total, the Debtor caused $300,000 to be improperly transferred to Korff, consisting of the Debtor assigning Korff $300,000 of his commission at the CPW closing (the "Korff Transfer").

72.　　The Debtor improperly conveyed to Herlihy: i) $71,800 from the River East Fee and ii) an assignment of $104,000 relating to the introduction of XE Capital to McLean ("the Herlihy Transfers").

73.　　The Debtor improperly conveyed $120,000 to John Livingston consisting of: i) an August 2, 2004 Butterfield Trust wire to repay a loan for living expenses and ii) an August 3, 2004 wire for $60,000 for consulting fees (the "Livingston Transfers").

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### (Turnover Against the Debtor Pursuant to 11 U.S.C. §542)

74.　　Plaintiff repeats and realleges each and every allegation above.

14

73.    The Debtor currently possesses and controls Funds Constituting Property of the Estate of the Debtor.  The Funds Constituting Property of the Estate constitute an asset of the Debtor's bankruptcy estate that has benefit and value to the Debtor's bankruptcy estate.

74.    The Debtor's retention of the Funds Constituting Property of the Estate is improper.

75.    Based on the foregoing, the Court should compel the Debtor to turn over the Funds Constituting Property of the Estate of the Debtor, and any other monies the Plaintiff determines through discovery are owed to the estate, to Plaintiff.

### SECOND CLAIM FOR RELIEF
### (Turnover Against the Debtor Pursuant to 11 U.S.C. §542)

76.    Plaintiff repeats and realleges each and every allegation above.

77.    The 20% interest in South Boston, which is currently held by the Debtor, constitutes property of the estate.  The 20% interest in South Boston constitutes an asset of the Debtor's bankruptcy estate that has benefit and value to the Debtor's bankruptcy estate.

78.    The Debtor remains in possession and control of the Debtor's property, *i.e.*, the 20% interest in South Boston.

79.    The Debtor's retention of the 20% interest in South Boston constituting property of the estate is improper.

80.    Based on the foregoing, the Court should compel the Debtor to turn over the 20% interest in South Boston, to Plaintiff.

### THIRD CLAIM FOR RELIEF
### ALL DEFENDANTS EXCEPT THE DEBTOR
### (Fraudulent Conveyance Pursuant to 11 U.S.C . §§544(b)

15

**and 550 and New York Debtor and Creditor Law §273)**

82.　　Plaintiff repeats and realleges each and every allegation set forth above.

83.　　The McLean Transfers, South Boston Transfer, PMD Transfers, Korff Transfer, Herlihy Transfers and Livingston Transfers made by the Debtor to the McLean Defendants, PMD Defendants, Korff, Herlihy and Livingston respectively were made at a time when the Debtor was insolvent or in the zone of insolvency. The McLean Transfers, South Boston Transfer, PMD Transfers, Korff Transfer, Herlihy Transfers and Livingston Transfers were made without fair consideration and constitute fraudulent conveyances as to creditors.

84.　　The Trustee is asserting the rights of unsecured creditors whose unsecured claims date back to the date of the initial fraudulent conveyance. The Trustee is also asserting the rights of open trade account creditors who extended credit to the Debtor at the time of the fraudulent conveyances and who continued to do so until the time of the bankruptcy.

85.　　By reason of the foregoing, such transfers should be avoided and Plaintiff is entitled to set aside and recover the value of such transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

**FOURTH CLAIM FOR RELIEF**
**(Fraudulent Conveyance Pursuant to 11 U.S.C. §§ 544(b)**
**and 550 and New York Debtor and Creditor Law §274)**

86.　　Plaintiff repeats and realleges each and every allegation contained above.

87.　　The McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers each caused the Debtor to become insolvent.

88.　　The McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff

16

Transfer, the Herlihy Transfers and the Livingston Transfers were made without fair consideration and constitute fraudulent conveyances as to creditors.

89.    The Trustee is asserting the rights of unsecured creditors whose unsecured claims date back to the date of the initial fraudulent conveyance.

90.    The Trustee is also asserting the rights of open trade account creditors who extended credit to the Debtor at the time of the fraudulent conveyances and who continued to do so until the time of the bankruptcy.

91.    By reason of the foregoing, the forgoing transfers should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000, plus interest.

**FIFTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS EXCEPT THE DEBTOR**
**(Fraudulent Conveyance Pursuant to 11 U.S.C. §§ 544(b)**
**And 550 and New York Debtor and Creditor Law §274)**

92.    Plaintiff repeats and realleges each and every allegation contained above.

93.    The aforementioned McLean Transfers, South Boston Transfers, PMD Transfers, Korff Transfer, Herlihy Transfers and Livingston Transfers from Debtor to the McLean Defendants, the PMD Defendants, Korff, Herlihy and Livingston respectively were made while the Debtor was engaged in a business for which the property remaining in its hands after the transfers was unreasonably small capital.

94.    The McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers were made without fair consideration and constitute fraudulent conveyances as to creditors at that time and as to other

17

persons who became creditors during the continuance of the business.

95.     By reason of the foregoing, the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000, plus interest.

### SIXTH CLAIM FOR RELIEF
**(Fraudulent Conveyance Pursuant to 11 U.S.C. §§ 544(b)
and 550 and New York Debtor and Creditor Law §275)**

96.     Plaintiff repeats and realleges each and every allegation contained above.

97.     The McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers were made while the Debtor intended to, or believed that it would, incur debts beyond its ability to pay as such debts matured.

98.     The McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers were made without fair consideration and constitute fraudulent conveyances as to both then present and future creditors.

99.     By reason of the foregoing, the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000, plus interest.

### SEVENTH CLAIM FOR RELIEF
**(Fraudulent Conveyance Pursuant to 11 U.S.C. §§544(b)
and 550 and New York Debtor and Creditor Law §276)**

100.    Plaintiff repeats and realleges each and every allegation contained above.

101.    The McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff

18

Transfer, the Herlihy Transfers and the Livingston Transfers were made with actual intent to hinder, delay or defraud either present or future creditors.

102.    By reason of the foregoing, the  McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

### EIGHTH CLAIM FOR RELIEF
### (FRAUDULENT CONVEYANCE PURSUANT TO
### 11 U.S.C. §§  548(a)(1)(A) AND 550)

103.    Plaintiff repeats and realleges each and every allegation above.

104.    The South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers were made with actual intent to hinder, delay or defraud an entity to which the Debtor was indebted or to which the Debtor became indebted after the date of the transfer of the Equity.

105.    The South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers constitute fraudulent conveyances as to the Estate's or Debtor's creditors.

106.    By reason of the foregoing, the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

### NINTH CLAIM FOR RELIEF
### (FRAUDULENT CONVEYANCE PURSUANT TO
### 11 U.S.C. §§  548(a)(1)(B)(i) and (ii)(I) AND 550)

19

107.    Plaintiff repeats and realleges each and every allegation above.

108.    The Debtor received less than a reasonably equivalent value in exchange for the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers.

109.    The Debtor was insolvent on the date of the McLean Transfers the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers or became insolvent as a result of the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers.

110.    The McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers constitutes fraudulent conveyances as to the estate's or Debtor's creditors.

111.    By reason of the foregoing, the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

**TENTH CLAIM FOR RELIEF**
**(FRAUDULENT CONVEYANCE PURSUANT TO**
**11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(III) AND 550)**

112.    Plaintiff repeats and realleges each and every allegation above.

113.    The Debtor received less than a reasonably equivalent value in exchange for the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers.

114.    At the time of the McLean Transfers, the South Boston Transfers, the PMD

20

Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers the Debtor intended to incur or believed that he would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

115.    The McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers constitute fraudulent conveyances as to the estate's or Debtor's creditors.

116.    By reason of the foregoing, the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

### ELEVENTH CLAIM FOR RELIEF
#### (Turnover Pursuant to 11 U.S.C. §542)

117.    Plaintiff repeats and realleges each and every allegation above.

118.    The funds transferred to the McLean Defendants, the PMD Defendants, Korff, Herlihy and Livingston via the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers, respectively constitutes Property of the Estate of the Debtor that have benefit and value to the Debtor's bankruptcy estate.

119.    The McLean Defendants, the PMD Defendants, Korff, Herlihy and Livingston remain in possession and control of the Property of the Debtor's Estate, i.e., the proceeds of the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers, respectively.

120.    The McLean Defendants, the PMD Defendants, Korff, Herlihy and Livingston

retention of the funds constituting property of the Estate is improper.

121.    Based on the foregoing, the Court should compel The McLean Defendants, the

PMD Defendants, Korff, Herlihy and Livingston to turn over the funds constituting the property

of the Estate of the Debtor, and any other monies the Trustee determines through discovery are

owed to the Estate, to the Trustee.

## TWELFTH CLAIM FOR RELIEF
### (Accounting)

122.    Plaintiff repeats and realleges each and every allegation contained above.

123.    The McLean Defendants, the PMD Defendants, Korff, Herlihy and Livingston

have profited from the McLean Transfers, the South Boston Transfers, the PMD Transfers, the

Korff Transfer, the Herlihy Transfers and the Livingston Transfers, respectively for which no

consideration or inadequate consideration was given to the Debtor.

124.    By reason of the foregoing, the Trustee is entitled to an accounting of all transfers

from the Debtor to the McLean Defendants, the PMD Defendants, Korff, Herlihy and Livingston

from January 1999 through the present and an accounting of the reasons for each transfer.

125.    In particular, the Trustee is entitled to an accounting of the Debtor and McLean's

interest in the South Boston project.

126.    Additionally, the Trustee seeks an accounting with respect to any additional

transfers by the Debtor designed to avoid his creditors, including to any of the Defendants, this is

revealed during discovery conducted in this action.

## THIRTEENTH CLAIM FOR RELIEF
### (POST-PETITION TRANSFER PURSUANT TO 11 U.S.C. §§ 549 AND 550)
### AGAINST THE DEBTOR, THE MCL DEFENDANTS AND HERLIHY

127.    Plaintiff repeats and realleges each and every allegation contained above as if fully

22

set forth herein.

128.    At a hearing held on July 27, 2007 in state court litigation pending in the New York State Supreme Court between Doubet, LLC and MCL, McLean and other parties, counsel for McLean and MCL advised the state court judge that MCL and/or McLean made a payment to the Debtor after his bankruptcy filing of approximately $300,000 with the consent of the Trustee ("MCL post-petition transfer").  The Trustee did not consent to this transfer.

129.    McLean also distributed the River East fee post-petition, by i) wiring $71,800 to Herlihy, ii) retaining $25,000 and iii) disbursing $340,200 to Norfolk ("River East post-petition transfers").

130.    The Debtor also received post-petition $500,000 for introducing McLean to XE Capital, and out of this introduction fee, kept $376,105 and assigned $104,000 to Herlihy and $22,895 to McLean ("XE Capital post-petition transfers").

131.    The MCL post-petition transfer, the River East post-petition transfers and the XE Capital post-petition transfers constituted property of the Debtor's bankruptcy estate.

132.    The MCL post-petition transfer, the River East post-petition transfers and the XE Capital post-petition transfers occurred after the commencement of the Debtor's bankruptcy case.

133.    The MCL post-petition transfer, the River East post-petition transfers and the XE Capital post-petition transfers were not authorized by the Bankruptcy Code or Court.

134.    By reason of the foregoing, the MCL post-petition transfer, the River East post-petition transfers and the XE Capital post-petition transfers must be avoided and Plaintiff is entitled to recover from the Debtor, the MCL Defendants and Herlihy, an amount to be determined at trial, which amount is not less than $1,237,000 plus interest.  Moreover, the

23

Trustee seeks to avoid any additional post-petition transfers that are uncovered during the course of discovery in this action.

WHEREFORE,  Plaintiff respectfully requests entry of judgment against Defendants:  (i) on the First Claim for Relief, directing the Debtor to turn over the Funds Constituting Property of the Estate of the Debtor, and any other monies the Plaintiff determines through discovery are owed to the estate, to Plaintiff, (ii) on the Second Claim for Relief, directing the Debtor to turn over the 20% interest in South Boston, to Plaintiff.; (iii) on the Third through Tenth Claims for Relief, voiding the McLean Transfers, the South Boston Transfers, the PMD Transfers, the Korff Transfer, the Herlihy Transfers and the Livingston Transfers and for damages on behalf of the Debtor in an amount to be determined at trial, which is not less than $5,000,000 as well as any additional amounts that may be revealed in discovery, plus interest; directing that a money judgment be entered for that amount, and attaching the assets of all Defendants to prevent transfers therefrom in the foregoing amounts; (iv) on the Eleventh Claim for Relief directing the McLean Defendants, the PMD Defendants, Korff, Herlihy and Livingston to turn over the funds constituting the property of the Estate of the Debtor, and any other monies the Trustee determines through discovery are owed to the Estate, to the Trustee; (v) on the Twelvth Claim for Relief directing an accounting of all transfers from the Debtor to the McLean Defendants, the PMD Defendants, Korff, Herlihy and Livingston from January 1999 through the present and an accounting of the reasons for each transfer, in particular, the Trustee is entitled to an accounting of the Debtor and McLean's interest in the South Boston project; (vi) on the Thirteenth Claim for Relief voiding the MCL post-petition transfer, the River East post-petition transfers and the XE Capital post-petition transfers and for damages on behalf of the Debtor in an an amount to be

24

determined at trial, which amount is not less than $1,237,000 plus interest as well as avoiding

any additional post-petition transfers that are uncovered during the course of discovery in this

action and (vii) granting the Trustee such other relief as is just and proper.


Dated: New York, New York
         October 12, 2007

                              STORCH AMINI & MUNVES, P.C.

                              By: _____
                                  Bijan Amini (BA 3533)
                                  Russell Bogart (RB 0302)
                                  Jonathan Bardavid (JB 0072)
                              140 East 45th Street, 25th Floor
                              New York, New York 10017
                              (212) 490-4100
                              Attorneys for Plaintiff

25

# EXHIBIT C

STORCH AMINI & MUNVES, P.C.
140 East 45th Street, 25th Floor
New York, New York 10017
Bijan Amini (BA 3533)
Russell Bogart (RB 0320)
Jonathan Bardavid (JB 0072)
212-490-4100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| DOUGLAS E. PALERMO, | : | Case No. 05 25081 (ASH) |
| | : | |
| Debtor. | : | |

-------------------------------------------------------------- -x

| | | |
|---|---|---|
| | : | |
| DAVID R. KITTAY, TRUSTEE, | : | Adv. Pro. No. 08-8205 (ASH) |
| | : | |
| Plaintiff, | : | |
| | : | |
| - against - | : | |
| | : | **AMENDED COMPLAINT** |
| | : | |
| DANIEL MCLEAN, MCL COMPANIES OF | | |
| CHICAGO, SB HOUSING ENHANCEMENT, LLC, | : | |
| Defendants. | : | |

-------------------------------------------------------------- x

David R. Kittay (the "Trustee" or "Plaintiff"), as Chapter 7 successor Trustee of the

bankruptcy estate of Douglas E. Palermo (the "Debtor"), by his attorneys, Storch Amini &

Munves, P.C., for his complaint against Daniel McLean ("McLean"), MCL Companies of

Chicago ("MCL"), South Boston Housing Enhancement, LLC ("SB Housing" collectively, with

McLean and MCL referred to as "MCL Defendants") alleges as follows:

## Introduction

1.    On October 14, 2005, the Debtor filed a petition seeking relief under Chapter 7 of

Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

2.     On October 16, 2005, Eric Kurtzman was appointed Chapter 7 trustee of the Debtor's estate.

3.     Mr. Kurtzman subsequently passed away and, on January 23, 2006, David R. Kittay was appointed Chapter 7 successor Trustee.

4.     Plaintiff is the duly qualified and acting Trustee herein.

5.     This is an adversary proceeding for conversion, fraudulent conveyance and the turnover of property of the estate pursuant to Sections 542(a) and (e) of the Bankruptcy Code and Rule 7001 et seq. of the Federal Rules of Bankruptcy Procedure.

### Jurisdiction and Venue

6.     This Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 1134(b) and 157(a) and (b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.

7.     This is a core proceeding under 28 U.S.C. §§ 157(b) (2) (A), (E), (H) and (O) and arises in the Chapter 7 case of the Debtor pending before this Court.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

### The Parties

9.     The Plaintiff maintains an office at 100 White Plains Road, Tarrytown, New York 10591.

2

10.    MCL Companies of Chicago is a company formed under the laws of the State of

Illinois with a principal place of business located at 455 East Illinois, Suite 565

Chicago, IL 60611.

11.    Daniel McLean is the President and sole shareholder of MCL.

12.    SB Housing Enhancement LLC is a limited liability company formed under the

laws of the State of Delaware with a principal place of business located at 1209 Orange Street,

Wilmington Delaware 19801.  The registered agent for SB Housing LLC is National Registered

Agents, Inc.

13.    The Debtor is an individual.

## FACTS

14.    Since 1970, the Debtor has worked as a self-employed real estate consultant.  The

services he provided included identifying real property development sites for clients, procuring

financing, and identifying potential purchasers or joint venture partners.

15.    Morris Silver ("Silver") is a certified public accountant who provided accounting

services to the Debtor and to certain of the Debtor's businesses.  Silver also occasionally loaned

money to the Debtor before and after 1990.  Silver organized and controlled an entity called

Doubet, LLC ("Doubet").

16.    In 1990, Silver commenced three lawsuits against the Debtor in the Supreme

Court of the State of New York, Nassau County, seeking to recover unpaid accounting fees and

unpaid notes executed by the Debtor.  Silver obtained three default judgments against the Debtor

in 1990, in the aggregate amount of $1,017,206 ("State Court Judgments").  As of the date of the

Debtor's bankruptcy filing, the Debtor owed $2,751,299, including statutory interest, on the State

3

Court judgments. Silver assigned the three State Court Judgments to Doubet.

17.    On March 3, 2006, after the filing date, Doubet commenced an adversary proceeding in the Debtor's bankruptcy case titled, <u>Doubet, LLC v. Douglas E Palermo</u>, Adv. Proc. No. 06-8285A (SDNY Bkrptcy), seeking that the Debtor should be denied a discharge under the Bankruptcy Code, 11 U.S.C. §§ 727(a)(2), (3) and (5). In a July 9, 2007 decision, issued after trial, the Court determined that the discharge should be denied on all three grounds. <u>See</u> the July 9, 2007 Decision annexed hereto as Exhibit A ("The Discharge Decision").

18.    The Discharge Decision found that the Debtor has been insolvent since the time that the State Court Judgments were entered against the Debtor in 1990. Additionally, the Court found that the Debtor "orchestrated complex deals to evade his creditors" and siphoned "off his money to his various shell entities." <u>Id.</u> at 17-19.

## I.    <u>Entities That The Debtor Controlled</u>

19.    N.M. Palermo, Inc. ("N.M. Palermo") was a company organized under the laws of the State of New Jersey on or about December 1927 by the Debtor's grandfather. N.M. Palermo's corporate charter was declared void by the State of New Jersey in or about May 1981.

20.    Beekman Street Advisory Corporation ("Beekman") was formed in or about 1996 and ceased to exist as a corporation in good standing in 1999. The Debtor was Beekman's sole shareholder.

21.    Argus Asset Management, LLC ("Argus") was purportedly formed in 2004 and ceased operations in 2005. The Debtor was the sole shareholder of Argus, which maintained a bank account.

22.    Norfolk Financial, LLC ("Norfolk"), was purportedly formed in 2004 but ceased

4

operations in 2005. Debtor was the sole shareholder of Norfolk, which maintained a bank account.

23.    Butterfield Trust I LLC ("Butterfield Trust") was purportedly formed by David Buchanan as managing member and sole shareholder between 2001 and 2002. The management of Butterfield Trust was subsequently transferred to William Chipman, a friend, accountant and business associate of the Debtor.

24.    Brook Financial LLC ("Brook") was organized in or about 2005 by the Debtor. The Debtor was the sole owner of Brook Financial LLC.

25.    Residual Equity Corp. ("Residual") was organized under the laws of Delaware as a corporation in December 2001.

26.    The above mentioned entities collectively shall be referred to as the "Palermo Entities."

27.    Palermo occasionally conducted his business activities under the names of the Palermo entities and funneled money which he earned to or through such entities. The Debtor cannot produce any organizational documents for any of these entities. Upon information and belief, the Palermo entities did not exist as lawful entities, but instead were simply exploited by the Debtor as a 'doing business as' ("d/b/a") the Debtor himself in his business dealings, either for tax purposes or to conceal his assets from his creditors. The Debtor solely controlled each of the Palermo entities and commingled monies among the Palermo entities. Hence, each of the Palermo entities represented an alter ego of the Debtor1.

**II.    455 Central Park West Transaction**

28.    The Trustee's claims in this action are based primarily on a series of lending and real estate transactions engineered by the Debtor to avoid his creditors. These transactions, relevant to the instant complaint, are briefly summarized below, and are described in more extensive detail in the Discharge Decision, annexed at Exhibit A, pp 5-8.

29.    In 1999, the Debtor collaborated with Columbia University and Bovis Lendlease to bid on a parcel of property located at 455 Central Park West (the "CPW Property").

30.    MCL submitted the winning bid for the CPW Property and MCL acquired the CPW Property in 1999. MCL created several entities for the purpose of purchasing and developing the property, including 455 CPW, LLC ("455 CPW") which developed the CPW Property into two buildings comprised of residential condominium units.

31.    As MCL acquired the CPW Property, the Debtor, based on his relationship with McLean the President of MCL, introduced Columbia University (with which the Debtor submitted the unsuccessful bid) to MCL so that Columbia University could purchase condominium units at the CPW Property from MCL.

32.    Columbia University contracted to purchase 53 condominium units in the 455 Central Park West project from MCL.

33.    MCL agreed to pay the Debtor a fee for introducing Columbia University to MCL as the buyer of 53 condominium units (the "455 CPW Closing").

34.    On August 28, 2001, Beekman and the Butterfield Trust (two of the Palermo entities) entered into the First Advisory Service Agreement (the "First Agreement") with 455 CPW. Pursuant to the First Agreement, Beekman and Butterfield Trust purported to act as the

---

1 This applies equally to Butterfield Trust.

exclusive financial advisor for 455 CPW in connection with the 455 CPW closing, even though all services were personally performed by the Debtor.

35.    The First Agreement provided that Debtor would receive compensation totaling $1,815,520 (the "First Agreement Fee"). The First Agreement provided that $453,880 of the First Agreement Fee was to be paid to Beekman upon 455 CPW obtaining a construction loan; the remaining $1,361,640 was payable to Butterfield Trust upon the closing of sale of the 53 condominium units from 455 CPW to Columbia University.

36.    The First Agreement also provided for a "Put and Call" option for Columbia University to purchase an additional 24 condominium units from 455 CPW.

37.    McLean negotiated and executed the First Agreement and dealt solely with the Debtor in connection with the First Agreement.

38.    On or about January 29, 2002, a Second Advisory Services Agreement (the "Second Agreement") was executed between 455 CPW and N.M. Palermo. The Second Agreement provided that 455 CPW would pay N.M. Palermo a 1% fee, or $330,000, for arranging a loan to 455 CPW through iStar, a source introduced by the Debtor to 455 CPW. The Second Agreement was signed on behalf of N.M. Palermo by the Debtor and was payable when iStar financed the loan to 455 CPW.

39.    Shortly after signing the First Agreement and Second Agreement, the Debtor requested an advance on his commissions from McLean. McLean agreed and authorized $140,000 in advances to the Debtor, personally, in four $35,000 installments which were paid to the Debtor on February 8, March 14, April 23 and June 3, 2002.

40.    On October 28, 2002, N.M. Palermo and 455 CPW entered into an Amended

7

Advisory Services Agreement (the "Amended Agreement") which amended the First Agreement and the Second Agreement. In the Amended Agreement, it was acknowledged that (1) the Debtor already received an advance of $140,000 on his fees, (2) at the loan closing, iStar, the lender, would advance to the Debtor the balance of Beekman's one percent commission, $313,880, which iStar could deduct from the loan to 455 CPW, (3) $1,361,640 was still due to Butterfield Trust upon closing of the sale of the condominium to Columbia University, and 4) Columbia University rather than 455 CPW would pay Palermo's balance at closing.

41.    That same day the parties agreed to the Debtor's fee arrangement for the "Put and Call" agreement, even though Columbia University never purchased the additional 24 units. The agreement provided for the same approximate amount due the Debtor, including the same $120,000 due from iStar at the impending loan closing and $203,176 from Columbia University out of the purchase price at the 455 CPW closing ("Put and Call Commission"). However, this agreement, which appears to have superseded the Second Agreement, alters the payor as well as the Palermo entity designated as payee.

### III.    Restraining Notices Are Served on the Debtor

42.    In February 2003, Silver served two sets of restraining notices on various parties including MCL and McLean, to facilitate collection of the State Court Judgments from the income due the Debtor under his real estate activities. See Discharge Decision, p. 9.

### IV.    Debtor Arranges to Circumvent the Restraining Notices

43.    Subsequent to learning of the first restraining notice, the Debtor arranged for several cash advances against the monies due to him under the First, Second and Amended Agreements from persons or entities not covered by the restraining notices. See Discharge

8

Decision, pp 10-11. In exchange, the Debtor assigned to those persons and entities money due from the 455 CPW transaction.

44.    On November 26, 2003, the Debtor obtained a $60,000 cash advance from McLean. In exchange, the Debtor assigned McLean $70,000 of his commission at the 455 CPW Closing;

45.    On July 29, 2004, at the 455 CPW Closing, Columbia closed on its purchase of the 53 units from 455 CPW. In 2002, the Debtor already had received the $140,000 advance from McLean and the $313,880 advance from iStar. As of the time of the 455 Central Park West Closing, the Debtor still was entitled to $1,361,640, as well as the $203,176 "Put and Call" commission, totaling $1,564,816.

46.    On July 29, 2004, the Debtor's commission of $1,564,816 was distributed, in relevant part, as follows: $70,000 to MCL as per McLean's assignment.

## V.    River East Transaction

47.    River East is a shopping center development in Chicago owned by McLean through one of his MCL entities.

48.    In 2005, the Debtor found a buyer for the retail space in River East. Pursuant to a letter agreement between the MCL Companies and Norfolk, dated August 29, 2005, the Debtor was entitled to a $437,000 commission for this introduction (the "River East Fee"). The sale relating to River East closed on January 17, 2006, several months after the Debtor filed for bankruptcy. The Debtor did not report in his bankruptcy schedule that he was entitled to the $437,000 River East Fee. At the time of closing, 455 CPW paid a $340,200 fee to Norfolk, as the Debtor had assigned $96,800 of the fee to other parties.

49.     The Debtor arranged for McLean to distribute the River East Fee, in relevant part as follows: McLean retained $25,000 in repayment of a $16,000 cash advance made by McLean in December 23, 2005.

## VI.     South Boston Development Project

50.     Prior to the summer of 2005, the Debtor owned 100% of Brook Financial, which fully owned South Boston Housing, LLC ("South Boston").  South Boston is a company incorporated by the Debtor to develop a housing project in South Boston, MA (the "South Boston Project").

51.     The Trustee has been advised that original estimates forecasted that the net income from the South Boston project would be approximately $29,500,000.

52.     McLean, through one of his entities, acquired 80% of the Debtor's interest in South Boston from the Debtor. McLean paid the Debtor $170,000 for the Debtor's expenses and $322,895 for Debtor's 80% interest in South Boston  ("South Boston Transfer").

53.     From August 5, 2005 through October 27, 2005, McLean paid Norfolk $322,895, based on McLean's purchase of 80% of Brook's interest in South Boston.

54.     The Debtor also introduced McLean to XE Capital to form a $50,000,000 fund for real estate investments, including the South Boston Project.  In August 2006, The Debtor received approximately $500,000 for making this introduction.  Out of this $500,000, the Debtor in relevant part, assigned $22,895 to McLean for repayment of an undisclosed cash advance.

## VII.     The Debtor's Unlawful Transfers

55.     In sum, the Debtor engaged in a pattern of activities designed to hinder his creditors, as described above, consisting of "taking cash advances on his future earnings,

10

assigning his payments to those lenders in repayment, transferring his property between accounts and squandering the balances." See Discharge Decision, at p. 17. Since the entry of the State Court Judgments in 1990, the Debtor was personally insolvent, and siphoned off his money to his various shell entities.

56.    The Debtor engaged in improper transfers to the McLean Defendants (the "McLean Transfers"), as described above, consisting of : 1) assigning McLean $70,000 of his commission at the 455 CPW closing; 2) McLean's retention of $25,000 from the Debtor's River East Fee; 3) McLean's retention of $22,895 relating to XE Capital and the South Boston project.

57.    The Debtor, through the South Boston Transfer, transferred 80% of the interest in Brook Financial to the McLean Defendants for only $322,000. This transfer was for grossly inadequate consideration. Accordingly, the Trustee seeks to recover the value of the South Boston Transfer from the McLean Defendants.

## VII.    The Initial Adversary Proceeding

58.    On October 12, 2007, the Trustee filed an adversary proceeding for turnover, conversion and fraudulent conveyance against the debtor, Daniel McLean, MCL Companies of Chicago, PMD Corporation, Brian Farley, Phillip Herlihy, Joseph Korff, John Livingston and SB Housing, LLC. The case was captioned Kittay v. Palermo, et. al, Adv. Proc. No. 07-8310 (ASH) (herein after the "Initial Adversary Proceeding").

59.    As the fraudulent conveyances occurred via a series of related and overlapping real estate transactions the Trustee included all of the defendants in the Initial Adversary Proceeding.

60.    On November 27, 2007 the parties, except for Joseph Korff and John Livingston,

11

appeared for an initial conference before Judge Hardin.

61.    At the conference Judge Hardin indicated that he was concerned with having one adversary proceeding involving multiple defendants, some of whom may have not been involved in some of the fraudulent conveyances.

62.    Plaintiff, through counsel, maintained that the transactions in questions were related and that the facts sufficiently overlapped to warrant one adversary proceeding.

63.    After a lengthy discussion with all parties who appeared in the action, Judge Hardin adjourned the conference until December 11, 2007, and ordered the parties to confer to discuss the issue of separating the Initial Adversary Proceeding, into separate adversary proceedings.

64.    The parties thereafter met and conferred about this issue.  Although plaintiff maintains that it was appropriate to bring one adversary proceeding against all the defendants, in the interests of judicial economy, the plaintiff agreed to divide the Initial Adversary Proceeding into multiple adversary proceedings.

65.    By agreement of the parties, the plaintiff agreed to amend the complaint in the Initial Adversary Proceeding and proceed solely against the debtor in that proceeding.

66.    The parties further agreed to the plaintiff filing separate adversary proceedings against each defendant or group of related defendants, provided however, that discovery would be conducted jointly for the related adversary proceedings.

67.    On December 11, 2007, a conference was held before Judge Hardin, on the initial adversary proceeding.  The parties set forth, and the court accepted, their agreement, concerning how to separate the initial adversary proceeding.

12

68.     The plaintiff was provided until January 7, 2007 to amend the initial adversary proceeding and to file the additional separate adversary proceedings.

69.     Judge Hardin held that for purposes of the statute of limitations, the date of filing for the additional adversary proceedings would relate back to the date the Initial Adversary Proceeding was filed.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
**(Fraudulent Conveyance Pursuant to 11 U.S.C . §§544(b) and 550 and New York Debtor and Creditor Law §273)**

70.     Plaintiff repeats and realleges each and every allegation set forth above.

71.     The MCL Transfers and the South Boston Transfer made by the Debtor to the MCL Defendants were made at a time when the Debtor was insolvent or in the zone of insolvency.  The MCL Transfers and the South Boston Transfers were made without fair consideration and constitute fraudulent conveyances as to creditors.

72.     The Trustee is asserting the rights of unsecured creditors whose unsecured claims date back to the date of the initial fraudulent conveyance.  The Trustee is also asserting the rights of open trade account creditors who extended credit to the Debtor at the time of the fraudulent conveyances and who continued to do so until the time of the bankruptcy.

73.     By reason of the foregoing, such transfers should be avoided and Plaintiff is entitled to set aside and recover the value of such transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

### SECOND CLAIM FOR RELIEF
**(Fraudulent Conveyance Pursuant to 11 U.S.C. §§ 544(b) and 550 and New York Debtor and Creditor Law §274)**

74.    Plaintiff repeats and realleges each and every allegation contained above.

75.    The MCL Transfers and the South Boston Transfer each caused the Debtor to become insolvent.

76.    The MCL Transfers and the South Boston Transfer were made without fair consideration and constitute fraudulent conveyances as to creditors.

77.    The Trustee is asserting the rights of unsecured creditors whose unsecured claims date back to the date of the initial fraudulent conveyance.

78.    The Trustee is also asserting the rights of open trade account creditors who extended credit to the Debtor at the time of the fraudulent conveyances and who continued to do so until the time of the bankruptcy.

79.    By reason of the foregoing, the forgoing transfers should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000, plus interest.

### THIRD CLAIM FOR RELIEF
**(Fraudulent Conveyance Pursuant to 11 U.S.C. §§ 544(b)
And 550 and New York Debtor and Creditor Law §274)**

80.    Plaintiff repeats and realleges each and every allegation contained above.

81.    The aforementioned MCL Transfers and the South Boston Transfer from Debtor to the MCL Defendants were made while the Debtor was engaged in a business for which the property remaining in its hands after the transfers was unreasonably small capital.

82.    The MCL Transfers and the South Boston Transfer were made without fair consideration and constitute fraudulent conveyances as to creditors at that time and as to other

14

persons who became creditors during the continuance of the business.

83.    By reason of the foregoing, the MCL Transfers and the South Boston Transfer should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000, plus interest.

**FOURTH CLAIM FOR RELIEF**
**(Fraudulent Conveyance Pursuant to 11 U.S.C. §§ 544(b)**
**and 550 and New York Debtor and Creditor Law §275)**

84.    Plaintiff repeats and realleges each and every allegation contained above.

85.    The MCL Transfers and the South Boston Transfer were made while the Debtor intended to, or believed that it would, incur debts beyond its ability to pay as such debts matured.

86.    The MCL Transfers and the South Boston Transfer were made without fair consideration and constitute fraudulent conveyances as to both then present and future creditors.

87.    By reason of the foregoing, the MCL Transfers and the South Boston Transfer should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000, plus interest.

**FIFTH CLAIM FOR RELIEF**
**(Fraudulent Conveyance Pursuant to 11 U.S.C. §§544(b)**
**and 550 and New York Debtor and Creditor Law §276)**

88.    Plaintiff repeats and realleges each and every allegation contained above.

89.    The MCL Transfers and the South Boston Transfer were made with actual intent to hinder, delay or defraud either present or future creditors.

90.    By reason of the foregoing, the MCL Transfers and the South Boston Transfer should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

### SIXTH CLAIM FOR RELIEF
### (FRAUDULENT CONVEYANCE PURSUANT TO
### 11 U.S.C. §§ 548(a)(1)(A) AND 550)

91.    Plaintiff repeats and realleges each and every allegation above.

92.    The MCL Transfers and the South Boston Transfer were made with actual intent to hinder, delay or defraud an entity to which the Debtor was indebted or to which the Debtor became indebted after the date of the transfer of the Equity.

93.    The MCL Transfers and the South Boston Transfer constitute fraudulent conveyances as to the Estate's or Debtor's creditors.

94.    By reason of the foregoing, the MCL Transfers and the South Boston Transfer should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

### SEVENTH CLAIM FOR RELIEF
### (FRAUDULENT CONVEYANCE PURSUANT TO
### 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I) AND 550)

95.    Plaintiff repeats and realleges each and every allegation above.

96.    The Debtor received less than a reasonably equivalent value in exchange for the MCL Transfers and the South Boston Transfer.

97.    The Debtor was insolvent on the date of the MCL Transfers and the South Boston Transfer or became insolvent as a result of the MCL Transfers and the South Boston Transfer.

98.    The MCL Transfers and the South Boston Transfer constitute fraudulent conveyances as to the estate's or Debtor's creditors.

99.    By reason of the foregoing, the MCL Transfers and the South Boston Transfer should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an

16

amount to be determined at trial, which is not less than $5,000,000 plus interest.

## EIGHTH CLAIM FOR RELIEF
### (FRAUDULENT CONVEYANCE PURSUANT TO
### 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(III) AND 550)

100.    Plaintiff repeats and realleges each and every allegation above.

101.    The Debtor received less than a reasonably equivalent value in exchange for the MCL Transfers and the South Boston Transfer.

102.    At the time of the MCL Transfers and the South Boston Transfer the Debtor intended to incur or believed that he would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

103.    The MCL Transfers and the South Boston Transfer constitute fraudulent conveyances as to the estate's or Debtor's creditors.

104.    By reason of the foregoing, the MCL Transfers and the South Boston Transfer should be avoided and Plaintiff is entitled to set aside and recover the value of the transfers in an amount to be determined at trial, which is not less than $5,000,000 plus interest.

## NINTH CLAIM FOR RELIEF
### (Turnover Pursuant to 11 U.S.C. §542)

105.    Plaintiff repeats and realleges each and every allegation above.

106.    The funds transferred to the MCL Defendants via the MCL Transfers and the South Boston Transfer constitutes Property of the Estate of the Debtor that have benefit and value to the Debtor's bankruptcy estate.

107.    The MCL Defendants remain in possession and control of the Property of the Debtor's Estate, i.e., the proceeds of the MCL Transfers and the South Boston Transfer.

108.    The MCL Defendants retention of the funds constituting property of the Estate is

17

improper.

109.    Based on the foregoing, the Court should compel the MCL Defendants to turn over the funds constituting the property of the Estate of the Debtor, and any other monies the Trustee determines through discovery are owed to the Estate, to the Trustee.

### TENTH CLAIM FOR RELIEF
### (Accounting)

110.    Plaintiff repeats and realleges each and every allegation contained above.

111.    The MCL Defendants have profited from the MCL Transfers and the South Boston Transfer for which no consideration or inadequate consideration was given to the Debtor.

112.    By reason of the foregoing, the Trustee is entitled to an accounting of all transfers from the Debtor to the MCL Defendants from January 1999 through the present and an accounting of the reasons for each transfer.

### ELEVENTH CLAIM FOR RELIEF
### (POST-PETITION TRANSFER PURSUANT TO 11 U.S.C. §§ 549 AND 550)

113.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.    At a hearing held on July 27, 2007 in state court litigation pending in the New York State Supreme Court between Doubet, LLC and MCL, McLean and other parties, counsel for McLean and MCL advised the state court judge that MCL and/or McLean made a payment to the Debtor after his bankruptcy filing of approximately $300,000 with the consent of the Trustee ("MCL Post-Petition Transfer").

115.    The Trustee did not consent to this transfer.

116.    McLean retained $25,000 of the River East fee post-petition. ("River East Post-

18

Petition Transfer").

117.    The Debtor also received $500,000 post-petition for introducing McLean to XE Capital, and out of this introduction fee, in relevant part, assigned $22,895 to McLean ("XE Capital Post-Petition Transfer").

118.    The River East Post-Petition Transfer and the XE Capital Post-Petition Transfer to McLean constituted property of the Debtor's bankruptcy estate.

119.    The River East Post-Petition Transfer and the XE Capital Post-Petition Transfer to McLean occurred after the commencement of the Debtor's bankruptcy case.

120.    The River East Post-Petition Transfer and the XE Capital post-petition transfer to McLean were not authorized by the Bankruptcy Code or Court.

121.    The MCL-Post Petition Transfer constituted property of the Debtor's bankruptcy estate.

122.    The MCL-Post Petetion Transfer occurred after the commencement of the Debtor's bankruptcy case.

123.    The MCL-Post Peteion Transfer was not authorized by the Bankruptcy Code or Court.

124.    By reason of the foregoing, MCL Post-Petition Transfer, the River East Post-Petition Transfer and the XE Capital Post-Petition Transfer must be avoided and Plaintiff is entitled to recover from McLean, an amount to be determined at trial, which amount is not less than $347,895 plus interest.

## TWELFTH CLAIM FOR RELIEF
### (CONVERSION)

125.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

126.    At a hearing held on July 27, 2007 in state court litigation pending in the New York State Supreme Court between Doubet, LLC and MCL, McLean and other parties, counsel for McLean and MCL advised the state court judge that MCL and/or McLean made a payment to the Debtor after his bankruptcy filing of approximately $300,000 with the consent of the Trustee ("MCL Post-Petition Transfer").

127.    The Trustee did not consent to the transfer.

128.    At the time MCL and/or McLean paid the $300,000 to the Debtor, they were aware that the Debtor had filed for bankruptcy.

129.    The $300,000 paid by McLean and/or MCL to the Debtor constituted property of the Debtor's Estate and was owed and due to the Estate.

130.    Defendants converted property of the Debtor's Estate by improperly transferring the $300,000 to the Debtor.

131.    By reason of the forgoing, the plaintiff has been damaged, in an amount to be determined at trial, which amount is not less than $300,000, plus interest.

## THIRTEENTH CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

132.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein

133.    Prior to the commencement of the Debtor's bankruptcy defendants had an

20

agreement to pay the Debtor $300,000.

134.    Upon the filing of the Debtor's petition for bankruptcy all monies due and owing to the Debtor were to be paid to the Trustee of the Debtor's Estate.

135.    The defendants breached their agreement by failing to pay the Debtor's Estate the $300,000.

136.    By reason of the foregoing, the plaintiff has been damaged in an amount to be determined at trial, which amount is not less than $300,000, plus interest.

WHEREFORE,  Plaintiff respectfully requests entry of judgment against Defendants:  (i) on the First through Eighth Claims for Relief, voiding the MCL Transfers and the South Boston Transfer and for damages on behalf of the Debtor in an amount to be determined at trial, which is not less than $5,000,000 as well as any additional amounts that may be revealed in discovery, plus interest; directing that a money judgment be entered for that amount, and attaching the assets of all Defendants to prevent transfers therefrom in the foregoing amounts; (ii) on the Ninth Claim for Relief directing the MCL Defendants to turn over the funds constituting the property of the Estate of the Debtor, and any other monies the Trustee determines through discovery are owed to the Estate, to the Trustee; (iii) on the Tenth Claim for Relief directing an accounting of all transfers from the Debtor to the MCL Defendants from January 1999 through the present and an accounting of the reasons for each transfer; (iv) on the Eleventh Claim for Relief voiding the MCL-Post Petetion Transfer, the River East Post-Petition Transfer and the XE Capital Post-Petition Transfer and for damages on behalf of the Debtor in an amount to be determined at trial, which amount is not less than $347,895 plus interest; (v) on the Twelfth and Thirteen Claims for Relief damages in the amount to be determined at trial, which amount is not less that $300,000;

21

and (v) granting the Trustee such other relief as is just and proper.

Dated: New York, New York
      January 10, 2008

STORCH AMINI & MUNVES, P.C.

By: _____
      Bijan Amini (BA 3533)
      Russell Bogart (RB 0302)
      Jonathan Bardavid (JB 0072)
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
Attorneys for Plaintiff

22

## **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK          )
                                               )ss.:
COUNTY OF NEW YORK   )

        Carla De Ycaza, being duly sworn, deposes and says:

        Deponent is not a party to the action, is over 18 years of age and resides in Queens, New York.

        On March 7, 2008 deponent served a true and correct copy of the within **DECLARATION OF JONATHAN BARDAVID** upon:

Carl Oberdier, Esq.
Schiff Hardin LLP
900 Third Avenue
New York, NY 10022

by depositing the same thereof enclosed in a postpaid wrapper marked for overnight delivery under the exclusive care and custody of Federal Express.

                           _____
                               Carla De Ycaza

Sworn to before me this
7th day of March, 2008

_____
  Notary Public